United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOLLY BROWN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MADISON REED, INC.,<br><br>Defendant. | Case No. 21-cv-01233-WHO<br><br>**ORDER GRANTING IN PART DENYING IN PART MOTION TO COMPEL ARBITRATION; GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**<br><br>Re: Dkt. Nos. 15, 16 |

Plaintiffs Keppie Moore and Molly Brown bring this class action lawsuit against defendant Madison Reed, Inc. ("Madison Reed"), a company that sells hair color products, alleging consumer protection claims under California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, and Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.* Madison Reed moves to compel one plaintiff, Brown, to arbitration and also to dismiss the Complaint as a whole for failure to state a claim.

Brown agreed to Madison Reed's Terms of Service, including an arbitration clause, via a clickwrap agreement when she purchased the hair color products that are the subject of this action. The "Arbitrator's Decision" subsection of that arbitration agreement is invalid under *McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017) because it improperly prohibits Brown from seeking a public injunction. But the *McGill*-violative subsection is severable from the rest of the arbitration agreement, which Brown does not challenge and that is not permeated with illegality. As a result, Madison Reed's motion to compel Brown to arbitration is DENIED with respect to her public injunctive relief claim but GRANTED for her remaining individual claims. This ruling does not impact plaintiff Moore.

United States District Court
Northern District of California

That said, none of the claims have been adequately pleaded in the Complaint. Plaintiffs list numerous misleading statements Madison Reed made on its packaging, website, commercials, and other platforms, but fail to specifically allege which, if any, of those statements they actually saw and relied upon before deciding to purchase the Madison Reed's products. Madison Reed argues that the statements listed in the Complaint are nonactionable puffery, verifiably accurate statements or do not amount to partial misrepresentations. Without knowing which statements are part of this lawsuit and which are not, I will not rule on the actionability of any statement. In addition to the fundamental Rule 9(b) pleading problem, plaintiffs also fail to plead their entitlement to equitable and injunctive relief. Madison Reed's motion to dismiss is GRANTED with leave to amend.

## BACKGROUND

### I.     ALLEGATIONS IN THE COMPLAINT

Madison Reed, founded in 2014, manufactures and sells Madison Reed Hair Color Products (the "products"). Complaint ("Compl.") [Dkt. No. 1] ¶ 2. It claims to "sell high quality hair color products that use ingredients that are less 'harsh' on hair health, as well as the health of the user, than traditionally-formulated hair color products" and that its products "were designed with consumers' 'well-being in mind.'" *Id.* ¶ 3.

Plaintiffs allege that Madison Reed made various false representations about its products on the product's packaging, on its website and elsewhere online, in mailed advertising and via television and radio commercials. *Id.* ¶ 49. They identify: (i) statements on the product's packaging, such as "Free of ammonia," "resorcinol" and "PPD" (p-phenylenediamine) (*id.* ¶ 28); (ii) similar statements in a description of the product on a third-party retail website, "Free of: ammonia," "resorcinol" and "PPD" (*id.* ¶ 27); (iii) four statements on Madison Reed's website, including "To provide the best, most luxurious hair color, *made with ingredients you can feel good about.*" (*id.* ¶ 21) (emphasis added); (iv) "*At the forefront of innovation, we created the first ever Smart 8-Free permanent hair color free of harsh ingredients:* ammonia, paraben, resorcinol, PPD, phthalates, gluten, SLS, and titanium oxide. And we added hair-loving nutrients including keratin, argan oil, and ginseng root extract to protect and pamper your hair." (*id.* ¶ 22) (emphasis added);

2

(v) "*We have a keen interest in your well-being.*  That's why we design our products with ingredients that nurture your hair and avoid those that don't . . ." (*id.* ¶ 26) (emphasis added); (vi) and a statement when it entered the men's hair and beard color market in 2020, claiming products for men are "free of 'bad stuff' and full of 'good stuff.'" (*id.* ¶ 29); (vii) a statement in a television commercial, "Introducing Madison Reed, gorgeous hair color you'll only find online.  *We started by throwing out the usual harsh ingredients, instead Madison Reed is packed with all the things healthy hair loves.*" (*id.* ¶ 24) (emphasis added); and (viii) a promotional message delivered by Madison Reed's Chief Executive Officer, Amy Errett, "And for those people that don't know, *one of the big purpose-driven pieces of Madison Reed is a set of ingredients in our hair color that I believe you could feel good about because we've taken out many of the harsh chemicals.*" (*id.* ¶ 25) (emphasis added).

Plaintiffs allege that these representations constitute both affirmative misrepresentations and actionable omissions or partial representations that are misleading and false. *Id.* ¶¶ 76, 89, 106.  In particular, they contend that Madison Reed falsely claims that its products do not contain "harsh ingredients" like ammonia, resorcinol, and PPD because the products contain other ingredients that are similar to ammonia, resorcinol, and PPD (namely, ethanolamine, 2-methylresorcinol and toluene-2,5-diamine sulfate) that are just as "harsh" on hair, if not harsher, and that are not less harmful to human health.  *Id.* at ¶¶ 8–10, 46–50.

Plaintiffs claim that they "relied on Defendant's false, misleading, and deceptive written misrepresentations on its website and on the packaging of the Products that stated it was 'Free of' 'ammonia,' 'PPD' and 'resorcinol,' in deciding to purchase the Products, believing that it was better for [their] hair and less harmful to [their] health." *Id.* ¶¶ 17–18.  Moore "purchased Madison Reed 'radiant Hair Color Kit' (Perugia Black) in, or about, February 2020 from Ulta Beauty located in Pasadena, California." *Id.* ¶ 17.  Brown "purchased Madison Reed 'radiant Hair Color Kits' (Catiana Brown and Ravenna Brown) online between early 2016 through 2018 through Defendant's website." *Id.* ¶ 18.  Had they "known the truth that the Products were not better for [their] hair or less harmful to [their] health, [they] would not have purchased [the] Products or would have paid less for them." *Id.* ¶¶ 17–18.  After using the products, Moore

United States District Court
Northern District of California

3

alleges that her "scalp became irritated, she suffered some hair loss, and the remaining hair on her head turned dry and brittle." *Id.* ¶ 17.  Brown's hair turned brittle as well and "she began to suffer some hair loss" but "[a]fter discontinuing the use of [the] hair color products, her hair loss ceased." *Id.* ¶ 18.

Plaintiffs bring causes of action for violation of the CLRA, FAL, and UCL, on behalf of a nationwide class of consumers who purchased Madison Reed products containing ethanolamine, 2-methylresorcinol and toluene-2,5-diamine sulfate. *Id.* ¶¶ 52, 61–113.  They seek monetary and injunctive relief, including "[a]n order enjoining [Madison Reed's] unlawful and deceptive acts and practices," "requiring [Madison Reed] to remove language from the Products' packaging, marketing, and advertising that represents that the product is free of 'bad stuff' and/or certain 'harsh' ingredients including, among others, ammonia, resorcinol and PPD, and any other misleading language relating to the Products' ingredients." *Id.* at 22–23 (Prayer for Relief ¶ F).

## II.     ARBITRATION AGREEMENT

With reference to Brown's claims, Madison Reed submits three copies of its Terms of Service that were in effect from September 9, 2015 to February 1, 2016 (the "2015 Terms of Service"), from February 1, 2016 to January 19, 2017 (the "2016 Terms of Service"), and from June 8, 2018 to September 19, 2019 (the "2018 Terms of Service").  *See* Declaration of Maureen Watson ("Watson Decl.") [Dkt. No. 15-1], ¶¶ 6–8, 10–12, Exs. A–C.  Madison Reed contends, and Brown does not dispute, that the 2018 Terms of Service apply to Brown because her last purchase was on March 7, 2019, when the 2018 Terms of Service were in effect.  *See id.* ¶¶ 4–12, 15e.  For purposes of evaluating the arbitration language at issue in this case, all three Terms of Service contain the same text.

The "Dispute Resolution" section of the Terms of Services contains multiple subsections. The "Agreement to Arbitrate" subsection states in relevant part:

> You and Madison Reed agree that any dispute, claim or controversy arising out of or relating to these Terms . . . or the use of the Services or Content (collectively, "Disputes") will be settled by confidential binding arbitration . . . You acknowledge and agree that you and Madison Reed are each waiving the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding . . . .

United States District Court
Northern District of California

2018 Terms of Service at 9–10.[1]  The subsection also contains the following "poison pill" provision: "If this specific paragraph is held unenforceable, then the entirety of this 'Dispute Resolution' section will be deemed void.  Except as provided in the preceding sentence, this 'Dispute Resolution' section will survive any termination of these Terms."  *Id.* at 10.

The "Arbitrator's Decision" subsection, which Brown argues contains unenforceable language, states in relevant part:

> The arbitrator will render an award within the time frame specified in the AAA Rules.  The arbitrator's decision will include the essential findings and conclusions upon which the arbitrator based the award. Judgment on the arbitration award may be entered in any court having jurisdiction thereof.  The arbitrator's award of damages must be consistent with the terms of the "Limitation of Liability" section above as to the types and amounts of damages for which a party may be held liable.  *The arbitrator may award declaratory or injunctive relief only in favor of the claimant and only to the extent necessary to provide relief warranted by the claimant's individual claim.*  If you prevail in arbitration you will be entitled to an award of attorneys' fees and expenses, to the extent provided under applicable law. Madison Reed will not seek, and hereby waives all rights it may have under applicable law to recover, attorneys' fees and expenses if it prevails in arbitration.

*Id.* at 10–11 (emphasis added).

## LEGAL STANDARD

## I.   MOTION TO COMPEL ARBITRATION

The Federal Arbitration Act ("FAA") governs the motion to compel arbitration.  9 U.S.C. §§ 1 *et seq.*  Under the FAA, a district court determines: (i) whether a valid agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue.  *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  "To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts."  *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks and citation omitted).  If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the

---

[1] Referring to the ECF-generated page numbers.

agreement." 9 U.S.C. § 4. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

## II.    MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## DISCUSSION

## I.    MOTION TO COMPEL ARBITRATION

Madison Reed's motion to compel Brown to arbitration primarily involves two disputes: (i) whether she assented to the arbitration agreement and (ii) whether the arbitration agreement (in whole or in part) is valid and enforceable.

### A.    Mutual Manifestation of Assent

The internet has "not fundamentally changed the requirement that mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Nguyen*

United States District Court
Northern District of California

*v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014); *see also Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 862 (2016) (relying on *Nguyen* and describing this as a "pure question of law").  Mutual assent does not require that the consumer have actual notice of the terms of an arbitration agreement.  *Long*, 245 Cal. App. 4th at 863.  Instead, a consumer is bound by an arbitration clause if "a reasonably prudent Internet consumer" would be put on "inquiry notice" of the "agreement's existence and contents."  *Id.*  "Contracts formed on the Internet come primarily in two flavors: 'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use; and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen."  *Nguyen,* 763 F.3d at 1175–76.

Madison Reed contends that Brown assented to its Terms of Service, including an arbitration clause, by both clickwrap and browsewrap agreement.  With respect to the first, customer records show that Brown made forty (40) online orders for Madison Reed products, many of which were recurring orders, from January 24, 2016 to March 7, 2019.  Watson Decl. ¶ 15.  She assented to the Terms of Service on January 24, 2016 (when she made her first online order) and again on February 7, 2016 (when she set up recurring orders) by clicking "Place Order," signifying her agreement to the Terms of Service.  *Id.* ¶¶ 15a, 13b.

As the below image shows, the payment screen Brown saw when setting up recurring orders states, "By clicking the checkbox above, I understand that my order includes auto-delivery" and "I also agree to the Terms & Privacy Policy".  *Id.* ¶ 14.  The "Terms & Privacy Policy" is set apart in bold and different color and provides a hyperlink to the Terms of Conditions and Privacy Policy.  Brown was required to check the box above that statement before clicking "Place Order" to complete her online purchase.  *See* Supplemental Declaration Maureen Watson [Dkt. No. 20-1] ¶ 4 (testifying that on February 7, 2016, Brown was required to click the check the box depicted below "[b]efore finalizing the recurring orders through the 'auto-delivery' system" by pressing the "Place Order" button and "did click and check that box and then clicked 'Place Order' to complete her auto-delivery recurring purchase").

Watson Decl. ¶ 14.

In addition to assenting to the Terms of Service by pressing a "Place Order" button, Madison Reed contends that Brown had further notice of the Terms of Service because Madison Reed posted them conspicuously on its website, which Brown visited at least six (6) times. *Id.* ¶¶ 13, 15. The Terms of Services were available by a link at multiple places on Madison Reed's website, including at the bottom of the homepage.



*Id.* ¶ 13.

United States District Court
Northern District of California

8

Brown argues that reference to the Terms at the bottom of Madison Reed's website cannot be sufficient to provide actual and inquiry notice. I agree. "Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement." *Nguyen*, 763 F.3d at 1177.

But the notice provided to her via clickwrap agreement during the order process, before she clicked "Place Order," is sufficient to establish her assent to the Terms of Service. Courts in this District have upheld similar agreements that require a computer user to consent to terms and conditions before proceeding with an internet transaction, even where the user is not required to check a separate dialog box to indicate assent. *See, e.g., Lee v. Ticketmaster LLC*, No. 18-CV-05987-VC, 2019 WL 9096442, at *1 (N.D. Cal. Apr. 1, 2019), *aff'd,* 817 F. App'x 393 (9th Cir. 2020) (finding "Lee was required to assent to the terms whenever he placed orders for tickets" and even though "Lee was not required to check a separate box to indicate his assent . . . Ticketmaster provided notice of the terms of use adjacent to the 'Place Order' button, included a hyperlink to the terms in a contrasting color, and informed the user that 'continuing past this page' (*i.e.,* placing an order) would indicate assent to the terms").

Brown concedes that the hyperlinked "Terms" above the "Place Order" button is noticeable but makes a passing argument that the notice may be insufficient according to my holding in *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728 (N.D. Cal. 2019). This case is unlike *Colgate*. *Colgate* involved a "sign-in wrap" agreement, which courts recognize as a third category of agreement that is a "hybrid" of the clickwrap and browsewrap agreements. *Id.* at 763. Considering an "early sign-up" screen that did not have a mandatory "clickwrap" clickbox and where the Terms and Condition disclosure below the "sign up button" was not presented in "a different color, underlined, italicized, or in any way visually distinct from the surrounding text," I concluded that the Terms and Conditions disclosure was "not conspicuous enough to put" plaintiffs on notice. *Id.* at 764–65. Addressing the "later sign-up" page I concluded that the addition of putting the hyperlinks in a different color was "without more" still not enough. *Id.* at 765–66 (distinguishing cases finding sufficient disclosure where hyperlinked terms were

1    "underlined, highlighted, in all caps, or in a box," and noting that on the later sign-in page the

2    hyperlink to the password recovery page was displayed much differently, having been bolded,

3    underlined, and in a larger font size than the Terms and Conditions hyperlink).

4        By contrast, every hyperlink in the dialog box right above the "Place Order" button on

5    Madison Reed's website is formatted identically—bolded, in purple color, and contrasted against

6    the remaining black text on a white background.  *See Hansen v. Ticketmaster Ent., Inc.*, No. 20-

7    CV-02685-EMC, 2020 WL 7319358, at *4 (N.D. Cal. Dec. 11, 2020) (distinguishing *Colgate* and

8    finding hyperlinks to Terms in dialog box conspicuous and sufficient to establish the required

9    inquiry notice).  Madison Reed has provided sufficient evidence showing that Brown assented to

10   the Terms of Service when she clicked the "Place Order" button, as required before she could

11   move on to purchase the products at issue in this case.  By assenting to the Terms of Service, she

12   also assented to the arbitration provision.

13       **B.    Validity of the Arbitration Agreement under *McGill***

14       If a valid arbitration clause exists, arbitration is mandatory.  But arbitration clauses "may

15   be invalidated by generally applicable contract defenses, such as fraud, duress, or

16   unconscionability."  *Rent-A-Ctr., West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (citations and

17   quotations omitted).  One such defense is that "a law established for a public reason cannot be

18   contravened by a private agreement."  *McGill*, 2 Cal. 5th at 962 (citations and quotations omitted).

19   *McGill* found that an arbitration agreement that prohibited plaintiffs from seeking a public

20   injunction—a remedy provided for under certain California consumer protection laws—was

21   invalid because it "seriously compromise[d] the public purposes [the laws] were intended to

22   serve."  *McGill*, 2 Cal. 5th at 962; *see Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 822 (9th Cir. 2019)

23   (finding California's *McGill* rule is not preempted by the FAA).

24       Brown's challenge to the validity of the arbitration agreement under *McGill* raises three

25   issues: (i) whether her claims carry public injunctive remedies that fall within the scope of *McGill*;

26   (ii) whether the arbitration agreement prohibits her from seeking a public injunction in any forum

27   and therefore is invalid under *McGill*; and (iii) whether the entire arbitration agreement is null and

28   void because a "poison pill" provision in the agreement has been triggered as a result of her

United States District Court
Northern District of California

10

1  seeking public injunctive relief.

2  **1.  Whether Brown's Claims Include Public Injunctive Relief**

3  To constitute public injunctive relief, the requested relief must "by and large" benefit the

4  general public.  *McGill*, 2 Cal. 5th at 955.  Public injunctive relief does not include relief in which

5  there is "no real prospective benefit to the public at large from the relief sought."  *Kilgore v.*

6  *Keybank*, N.A., 718 F.3d 1052, 1061 (9th Cir. 2013) (en banc).  "Merely declaring that a claim

7  seeks a public injunction, however, is not sufficient to bring that claim within the bounds of the

8  rule set forth in *McGill*."  *Blair v. Rent-A-Ctr., Inc.*, No. C 17-02335 WHA, 2017 WL 4805577, at

9  *2 (N.D. Cal. Oct. 25, 2017), *aff'd in part, appeal dismissed in part*, 928 F.3d 819 (9th Cir. 2019).

10  Brown, on behalf of the putative class, seeks public injunctive relief on her claims pursuant

11  to the CLRA, FAL, and UCL.  *See* Compl. ¶¶ 82, 95–96, 111, 113.  Among other things, she seeks

12  an injunction "requiring [Madison Reed] to remove language from the Products' packaging,

13  marketing, and advertising that represents that the product is free of 'bad stuff' and/or certain

14  'harsh' ingredients including, among others, ammonia, resorcinol and PPD, and any other

15  misleading language relating to the Products' ingredients."  *Id.*, Prayer for Relief ¶ F.  By seeking

16  to enjoin Madison Reed from continuing its false and misleading advertising to the general public,

17  Brown requests a public injunctive relief that is similar to the relief sought in *McGill*.  *See McGill*,

18  2 Cal. 5th at 954–55 (finding CLRA, UCL, and FAL provide for public injunctive relief, and

19  therefore a plaintiff's right to seek an injunction pursuant to these laws cannot be waived through

20  an arbitration agreement, where plaintiff sought to enjoin defendant bank from falsely advertising

21  its "credit protector" plan); *see also Blair*, 928 F.3d at 831 n.3 (rejecting the defendant's

22  contention that the plaintiffs had not sought a public injunction because the plaintiffs sought "to

23  enjoin future violations of California's consumer protection statutes, relief oriented to and for the

24  benefit of the general public").

25  Madison Reed says that Brown's request for public injunctive relief is merely incidental to

26  her primary aim of gaining compensation for alleged injury to herself.  But the Central District

27  cases on which it relies "take a narrow definition of public injunctive relief" and are unpersuasive

28  "because those cases do not address the fact that *McGill* allowed public injunctive relief in a very

United States District Court
Northern District of California

11

similar situation to the case at bar." *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1258 (N.D. Cal. 2019) (citing *Johnson v. JP Morgan Chase Bank, N.A.*, No. EDCV 17-2477 JGB, 2018 WL 4726042, at *6 (C.D. Cal. Sept. 18, 2018), *Rappley v. Portfolio Recovery Assocs., LLC*, No. EDCV 17-108 JGB, 2017 WL 3835259, at *6 (C.D. Cal. Aug. 24, 2017), and *Wright v. Sirius XM Radio, Inc.*, No. SACV 16-1688 JVS, 2017 WL 4676580, at *9 (C.D. Cal. Jun. 1, 2017)). Although *Eiess* applied the *McGill* rule under a choice-of-law analysis (as opposed to a motion to compel arbitration), it addressed the same question raised here—whether the plaintiff "is seeking public injunctive relief under *McGill*." *Eiess*, 404 F. Supp. 3d at 1259. The plaintiff there "clearly [sought] public injunctive relief" based on allegations that are similar to what Brown pleads here. *See id.* at 1258 (plaintiff brought UCL and CLRA claims and "asked the Court to enjoin USAA from future violations of California consumer protection statutes by forcing USAA to amend its Deposit Agreement (which is available to the public to review) to better reflect its actual practices of charging multiple NSF Fees," a relief that "transcends her personal situation and relief").

Madison Reed's remaining citation, *Sponheim v. Citibank, N.A.*, No. SA CV-19-264-JVS-ADSX, 2019 WL 2498938, at *5 (C.D. Cal. Jun. 10, 2019), is also distinguishable because the claims at issue there "[arose] from alleged breaches of bilateral contracts between [the defendant bank] and its California account holders, and those account holders' prayers for monetary relief [were] at the 'heart' of [the plaintiff's] claims." *See Fernandez v. Bridgecrest Credit Co., LLC*, No. EDCV 19-877-MWF-SHK, 2019 WL 7842449, at *5 (C.D. Cal. Oct. 29, 2019) (finding plaintiffs sought public injunctive relief under *McGill* and distinguishing cases, including *Sponheim*, on grounds that those cases "largely dealt with claims (1) arising out of breaches of contract [as opposed to false advertisement cases], (2) which only dealt with past harms, or (3) which stated public injunctive relief that was too vague").

Based on a review of the Complaint, Brown seeks public injunctive relief within the scope of *McGill*.

## 2.   Whether the Arbitration Clause Prohibits Brown From Seeking a Public Injunction

Given that *McGill* applies, I next address whether the arbitration agreement prohibits

1   Brown from seeking a public injunction in any forum and therefore invalid under *McGill*.  Brown

2   contends that the following sentence in the "Arbitrator's Decision" subsection of the arbitration

3   agreement improperly prohibits her from seeking a public injunction:

> The arbitrator may award declaratory or injunctive relief *only in favor*
> *of the claimant* and *only to the extent necessary to provide relief*
> *warranted by the claimant's individual claim.*

6   Watson Decl., Ex. C at 10–11 (emphasis added).

7         This language is virtually identical to the language at issue in *Tillage v. Comcast Corp.*,

8   772 F. App'x 569 (9th Cir. 2019), *cert. denied,* 140 S. Ct. 2827 (2020) and *McArdle v. AT&T*

9   *Mobility LLC*, 772 F. App'x 575 (9th Cir. 2019), *cert. denied,* 140 S. Ct. 2827 (2020), where the

10  Ninth Circuit held that *McGill* invalidated the arbitration provisions at issue.  The agreement in

11  *Tillage* provided that "[t]he arbitrator may award relief *only in favor of the individual party*

12  *seeking relief* and *only to the extent necessary to provide relief warranted by that individual*

13  *party's claim.*"  Declaration of George V. Granade [Dkt. No. 17-1], Ex. 1 (copy of arbitration

14  agreement filed in the *Tillage* district court case) (emphasis added).  The agreement in *McArdle*

15  similarly provided that "[t]he arbitrator may award declaratory or injunctive relief *only in favor of*

16  *the individual party seeking relief* and *only to the extent necessary to provide relief warranted by*

17  *that party's individual claim.*"  *McArdle v. AT&T Mobility LLC*, No. 09-CV-01117-CW, 2017 WL

18  4354998, at *1 (N.D. Cal. Oct. 2, 2017), *aff'd,* 772 F. App'x 575 (9th Cir. 2019) (emphasis

19  added).

20        Madison Reed attempts to undermine *Tillage* and *McArdle* on grounds that they are both

21  unpublished memorandum dispositions.  *Tillage* and *McArdle* were entered on the same day as

22  *Blair*, a 2019 published decision where the Ninth Circuit upheld the *McGill* rule as not preempted

23  by the FAA.  While unpublished decisions are not precedential, *Tillage* and *McArdle* are directly

24  on point here and provide guidance on the kind of arbitration language that violates *McGill*.

25        The Ninth Circuit's recent opinion in *DiCarlo v. MoneyLion, Inc.*, 988 F.3d 1148 (9th Cir.

26  2021) does not undermine *Tillage* and *McArdle* either.  In *DiCarlo*, the Ninth Circuit considered

27  whether an agreement providing for individual arbitration precluded public injunctive relief in

28  arbitration.  *Id.* at 1153.  The agreement explicitly authorized the arbitrator to award injunctive

United States District Court
Northern District of California

United States District Court
Northern District of California

relief and only limited relief to what was "available in an individual lawsuit." *Id.* The Ninth Circuit reasoned that relief protecting many people could be obtained through a claim brought by one person. *Id.* at 1156. Because the plaintiff was "free to seek public injunctive relief in arbitration," the Ninth Circuit concluded that the agreement did not violate *McGill*. *Id.* at 1158. Unlike the provision at issue in *DiCarlo*, which authorized an arbitrator to "award all [injunctive] remedies available in an individual lawsuit under [California] law," *id.* at 1153, the provision here is more restrictive and authorizes an arbitrator to award "injunctive relief *only in favor of the claimant* and *only to the extent necessary to provide relief warranted by the claimant's individual claim*." Watson Decl., Ex. C at 10–11 (emphasis added). The provision here does not allow Brown to seek public injunctive relief in arbitration.

Madison Reed's reliance on *Hill v. BBVA USA*, No. 20-CV-1016 JLS (WVG), 2021 WL 2206477 (S.D. Cal. Jun. 1, 2021) is misplaced for similar reasons. The arbitration agreement in *Hill* "explicitly state[d]" that plaintiffs can "[g]et an injunction," and only "limit[ed] representative actions and [did] not restrict the arbitrator's ability to award public injunctive relief." *Id.* at *4. The arbitration agreement in *Hill* permitted "arbitrators to award *any* 'remedy' or 'relief' available to a litigant in court." *Id.* (emphasis added). The arbitration provision here does not provide such leeway.

Pursuant to *McGill*, the arbitration agreement's preclusion of claims seeking public injunctions is unenforceable.

### 3.   Whether the "Poison Pill" Provision Has Been Triggered, Voiding the Entire Arbitration Agreement

Brown argues that the entire arbitration agreement is null and void because a "poison pill" in the agreement has been triggered as a result of her seeking public injunctive relief. She identifies the following sentence as the poison pill provision: "If this specific paragraph is held unenforceable, then the entirety of this 'Dispute Resolution' section will be deemed void." Watson Decl., Ex. C at 10.

Madison Reed points out that the poison pill language Brown relies on is contained in a separate subsection, titled "Agreement to Arbitrate," and the placement in separate paragraphs is

determinative because it states, "*If this specific paragraph* is held unenforceable, then the entirety of this 'Dispute Resolution' section will be deemed void," and goes on to state "[e]xcept as provided in the preceding sentence, *this 'Dispute Resolution' section will survive any termination of these Terms*." *Id.* at 10 (emphasis added). Because Brown challenges language contained in the "Arbitrator's Decision" paragraph as violative of *McGill* and does not challenge the "Agreement to Arbitrate" paragraph that contains the poison pill provision, Madison Reed argues that the poison pill provision has not been triggered. It asks that Brown's public injunctive relief claim be severed to remain in this court while all her other claims go to arbitration.

Brown responds, relying on *Hunter v. Kaiser Found. Health Plan, Inc.*, 434 F. Supp. 3d 764, 779 (N.D. Cal. 2020) (citing *Baker v. Acad. of Art Univ. Found.*, No. 17-CV-03444-JSC, 2017 WL 4418973, at *5 (N.D. Cal. Oct. 5, 2017), that the two subsections should not be severed because they work together and severing them would amount to "rewriting or defeating the purpose of the mutually agreed-to arbitration provision." Neither case helps her position. Severance was warranted in *Baker* because "California courts prefer to sever provisions rather than hold an entire agreement unenforceable[,]" and the provision at issue was not integral to the remaining terms and was easily severable, and in light of the strong public policy favoring arbitration. *Baker*, 2017 WL 4418973, at *5. Relying on the reasoning in *Baker*, I found that the unconscionable provisions in *Hunter* (attorney fees and cost-splitting provisions) were "discrete provisions" that "can be severed without rewriting or defeating the purpose of the mutually agreed-to arbitration provision." *Hunter*, 434 F. Supp. 3d at 779.

Brown fails to show how the *McGill*-violative provision here (*i.e.*, a provision restricting public injunctive relief) is integral to the remaining terms. Nor does she cite any other case in which a *McGill*-violative provision was found to be inseparable from the rest of the arbitration agreement or where severing a *McGill*-violative provision would amount to "rewriting" the arbitration agreement.[2] To the contrary, there is at least one analogous case in which a *McGill*-

---

[2] At the hearing, Brown tried to connect *Hunter* to this case on grounds that the *McGill* issue was raised in both cases. *McGill* was addressed in *Hunter* only to the extent that I found it inapplicable in the first instance given that the plaintiff "point[ed] to nothing in the Agreement [] that would preclude the arbitrator from awarding public injunctive relief." *Hunter*, 434 F. Supp. 3d at 781.

United States District Court
Northern District of California

United States District Court
Northern District of California

violative provision was severed from the rest of the arbitration agreement. In *Nguyen v. Tesla, Inc.*, the court found "severance [] appropriate, because other than [the *McGill*-violative] unenforceable provision, the Agreement to Arbitrate [was] not permeated with illegality." No. 819CV01422JLSJDE, 2020 WL 2114937, at \*5 (C.D. Cal. Apr. 6, 2020), *reconsideration denied,* No. 819CV01422JLSJDE, 2020 WL 4530426 (C.D. Cal. July 24, 2020), *appeal dismissed,* No. 20-55873, 2020 WL 6875203 (9th Cir. Nov. 20, 2020); *see also Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1273 (9th Cir. 2017) ("[T]he dispositive question is whether 'the central purpose of the contract' is so tainted with illegality that there is no lawful object of the contract to enforce.") (quoting *Marathon Entm't, Inc. v. Blasi*, 42 Cal. 4th 974, 996 (2008)). Likewise, "[b]ecause [Brown's] lone substantive unconscionability argument concerns the arbitrability of [her] requests for public injunctive relief under the CLRA, UCL, and FAL," I will "sever[] those remedies from the scope of the arbitration agreement." *Nguyen v. Tesla, Inc.*, 2020 WL 2114937, at \*5.

Madison Reed's motion to compel Brown to arbitration is DENIED with respect to her public injunctive relief claim, but otherwise GRANTED for her remaining individual claims.

## II.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### A.   Consumer Protection Statutory Claims

Plaintiffs do not dispute that their UCL, FAL, and CLRA claims must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) ("[W]e have specifically ruled that Rule 9(b)'s heightened pleading standards apply to claims for violations of the CLRA and UCL."); *Brazil v. Dole Food Co., Inc.*, 935 F. Supp. 2d 947, 963 (N.D. Cal. 2013) (applying Rule 9(b)'s heightened pleading standard to FAL claims for misleading, deceptive, and untrue advertising). When CLRA, FAL, and UCL claims are premised on misleading advertising or labeling, Rule 9(b) requires the plaintiff to allege "the particular circumstances surrounding [the] representations" at issue. *Kearns*, 567 F.3d at 1126. This rule applies regardless of whether the statements at issue are

---

The precise issue here—severance of a *McGill*-violative provision—was not addressed in *Hunter*.

1    misleading because they are affirmative misrepresentations or because they contain material

2    omissions.  *See* Compl. ¶¶ 76, 89, 106 (alleging affirmative misrepresentations and "[a]dditionally,

3    or alternatively, Defendant has violated the [CLRA, FAL, and UCL] by making material

4    omissions"); *see, e.g.*, *Williamson v. Reinalt-Thomas Corp.*, No. 5:11-CV-03548-LHK, 2012 WL

5    1438812, at *13 (N.D. Cal. Apr. 25, 2012) (citing *Kearns*, 567 F.3d at 1127, for the proposition

6    that "a claim based on a nondisclosure or omission is a claim for misrepresentation in a cause of

7    action for fraud, and it must be pleaded with particularity under Rule 9(b)").

8         Plaintiffs list numerous misleading and fraudulent statements Madison Reed made on its

9    product packaging, website, the website of its third party retailors, TV commercials, and

10   promotional video messages by its CEO.  *See* Compl. ¶¶ 20–30.  Both in the Complaint and in

11   their opposition, plaintiffs place particular emphasis on various "harsh ingredient" statements

12   made on Madison Reed's website (on different webpages), in a TV commercial, and by its CEO.

13   *See id.* ¶ 22, 24–25 (alleging misleading statement on website "permanent hair color free of harsh

14   ingredients"; misleading statement in TV commercial "We started by throwing out the usual harsh

15   ingredients, instead Madison Reed is packed with all the things healthy hair loves"; and

16   misleading statement by CEO, "one of the big purpose-driven pieces of Madison Reed is a set of

17   ingredients in our hair color that I believe you could feel good about because we've taken out

18   many of the harsh chemicals").

19        The defect in the pleading is that plaintiffs fail to allege that they saw or relied upon

20   specific statements in deciding to purchase the Madison Reed's products.  They only generally

21   allege that they "relied on Defendant's false, misleading, and deceptive written misrepresentations

22   on its website and on the packaging of the Products that stated it was 'Free of' 'ammonia,' 'PPD'

23   and 'resorcinol,' in deciding to purchase the Products, believing that it was better for her hair and

24   less harmful to her health."  *Id.* ¶¶ 17–18.  But without allegations clarifying which, if any, of the

25   statements described in the Complaint plaintiffs actually relied upon before deciding to purchase

26   the Madison Reed products, the heightened pleading standard of Rule 9(b) is not met.  *See Tabler

27   v. Panera LLC,* No. 19-CV-01646-LHK, 2019 WL 5579529, at *11 (N.D. Cal. Oct. 29, 2019)

28   (finding "rote allegation that in deciding to make these purchases, Plaintiff saw, relied upon, and

United States District Court
Northern District of California

reasonably believed Defendant's representations that the Products were '100% clean' or 'clean'" insufficient to meet the Rule 9(b) standard" and noting "[t]his is particularly significant because each of the 'representative' advertisements that Plaintiff includes in the complaint contains different language").

Plaintiffs also fail to specifically allege when they viewed Madison Reed's representations. They rely on *In re ConAgra Foods, Inc.*, 908 F. Supp. 2d 1090, 1100 (C.D. Cal. 2012), where the court "[did] not believe that requiring that plaintiffs allege specific dates on which they saw the representations [was] necessary or realistic." Whether or not specific dates are required, they have not even provided a rough approximation here. They only provide a date range of when they purchased the products, without clarifying which statements they relied on and if they viewed/relied on such statements around the time of purchase. *See* Compl. ¶¶ 17–18 (alleging Moore purchased in-store around February 2020 and Brown bought online between early 2016 through 2018)

The timing is significant here. Some of Madison Reed's statements were made at different times. For example, Madison Reed launched a "men's hair and beard" marketing campaign in 2020 in which it made statements like free of "bad stuff" and full of "good stuff'," but Brown alleges that she only bought products from "early 2016 through 2018" and does not specify whether she was viewing/relying on advertisements geared towards "men's hair and beard" when making her purchases online. Compl. ¶ 18, 29.

A similar timing problem arose in in *Tabler v. Panera LLC*, No. 19-CV-01646-LHK, 2020 WL 3544988 (N.D. Cal. Jun. 30, 2020). The court found that "Plaintiff's failure to specify when she viewed Defendant's advertisements compounds the uncertainty" because plaintiff simply alleged that she bought products during the class period, which began as far back as 2015, whereas some of the advertisement at issue "only began on January 13, 2017." *Id.* at *7. Accordingly, "Plaintiff could not have relied on any of Defendant's '100% clean' advertisements in 2015 or 2016 before Defendant began its '100% clean' advertising campaign on January 13, 2017." *Id.* Without an explanation of "*which precise statement* she relied upon in making her purchasing decisions *or when Plaintiff allegedly saw the relevant advertisements*," the court concluded that

"Plaintiff has not given Defendant sufficient notice to enable Defendant to mount a defense" and "[t]hus, the FAC 'fails to give [Defendant] the opportunity to respond to the alleged misconduct.'" *Id.* (quoting *Kearns*, 567 F.3d at 1126) (emphasis added); *see also Janney v. Mills,* 944 F. Supp. 2d 806, 818 (N.D. Cal. 2013) ("Rule 9(b) requires that the plaintiff(s) identify specific advertisements and promotional materials" and "allege when the plaintiff(s) were exposed to the materials[.]"); *Johnson v. Glock, Inc.*, No. 3:20-CV-08807-WHO, 2021 WL 428635, at *4 (N.D. Cal. Feb. 8, 2021) (finding that the "when" element was not adequately pleaded in defective handgun class action because plaintiff not only "fail[ed] to allege when he purchased his gun, he fail[ed] to allege the time period he was shopping for it—and therefore would allegedly have seen any disclosures").

Plaintiffs alternatively argue that they are not required to plead individualized reliance on specific misrepresentations in light of the ruling in *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009). The California Supreme Court held that when "a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements." *Id.* at 328. A plaintiff may "plead and prove actual reliance" without pointing to "specific misrepresentations" where the alleged misrepresentations "were part of an extensive and long-term advertising campaign." *Id.* Plaintiffs contend that Rule 9(b) may not be read to require them to plead reliance on specific advertisements when *In re Tobacco II* applies.

As the California Court of Appeal subsequently explained in *Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622, 632 (2010), the scope of the *In re Tobacco II* exception is narrow. *In re Tobacco II* "does not stand for the proposition that a consumer who was never exposed to an alleged false or misleading advertising or promotional campaign" may bring a claim for relief. *Id.* "Rather, *In re Tobacco II* stands for the narrower, and more straightforward proposition that, where a plaintiff has been exposed to numerous advertisements over a period of decades, the plaintiff is not required to 'plead with an unrealistic degree of specificity [the] particular advertisements and statements' that she relied upon." *Kane v. Chobani, Inc.*, No. 12-CV-02425-LHK, 2013 WL 5289253, at *9 (N.D. Cal. Sept. 19, 2013) (refusing to apply *In re Tobacco II*

1    exception where plaintiffs "have not alleged anything approaching a 'decades-long campaign of

2    deceptive advertising'"); *see also Haskins v. Symantec Corp.*, No. 13-CV-01834-JST, 2013 WL

3    6234610, at *5 (N.D. Cal. Dec. 2, 2013) (finding "the *Tobacco II* 'exception' appears to be a

4    narrow one" and that the plaintiff failed to "demonstrate[] that she falls within it" because "[t]o

5    adequately allege a fraudulent misrepresentation claim under the UCL and the CLRA without

6    pleading that she saw a specific misrepresentation, a plaintiff must [] show that hers is the type of

7    claim encompassed by the *Tobacco II* case, and also that the long-term advertising campaign to

8    which she was exposed affected her decision to purchase the product").[3]

9        The narrow *In re Tobacco II* exception is not applicable based on the facts alleged in the

10   Complaint.  Although plaintiffs rely *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962 (N.D. Cal. 2015),

11   where exposure to a long-term advertising campaign was sufficiently alleged, they fail to explain

12   how their allegations are analogous.  *Opperman* identified six factors relevant to the *In re Tobacco*

13   *II* inquiry, none of which plaintiffs meaningfully engage with here.  *See, e.g., Tabler*, 2020 WL

14   3544988, at *10 (rejecting plaintiff's attempt to invoke the *In re Tobacco II* exception and

15   distinguishing *Opperman* on grounds that "the length of Defendant's alleged advertising campaign

16   was, at best, less than half of the five-year campaign in *Opperman*" and "unlike in *Opperman*, the

17   balancing of the six factors does not weigh in favor of Plaintiff").

18       Plaintiffs cite my ruling in *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1195

19   (N.D. Cal. 2014), where I rejected a defendant waffle company's argument that "the complaint is

20   too vague because it does not list every single product which is allegedly mislabeled" because the

21   company could "easily determine which products are at issue" given that "the products all involve

22   the same misrepresentation: food products labeled 'All Natural' that contain [sodium acid

23

24   [3] After the plaintiff in *Haskins* amended her complaint, the court again dismissed for failure to
     satisfy Rule 9(b).  The court concluded that conclusorily pleading that the plaintiff "'relied' on a
25   very long list of representations, and that she was 'exposed to' those representations" was
     "insufficient to plead [] UCL and CLRA claim[s] grounded in fraud." *Haskins v. Symantec Corp.*,
26   No. 13-CV-01834-JST, 2014 WL 2450996, at *1 (N.D. Cal. Jun. 2, 2014).  The Ninth Circuit
     affirmed. *Haskins v. Symantec Corp.*, 654 F. App'x 338 (9th Cir. 2016) (unpublished).
27   Specifically, the Ninth Circuit held that "[b]ecause Haskins's complaint did not allege that she
     read and relied on a specific misrepresentation by Symantec, she failed to plead her fraud claims
28   with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure." *Id.* at 339.

United States District Court
Northern District of California

pyrophosphate]."  Plaintiffs ignore the part of that opinion that matters here.  Although addressed as a standing issue, and not a Rule 9(b) issue, I dismissed the *Ham* plaintiffs' challenge to the statements or advertisements the waffle company made on its website or Facebook because the plaintiff "[did] not contend that she did in fact see Hain's Facebook or www.earthbest.com websites or could amend her complaint to plead reliance on those statements."  *Id.* at 1197.  Similarly, Brown and Moore do not contend that they saw all of the advertisements listed in the Complaint, particularly the "harsh" ingredient statements that they emphasize as the basis of their false advertising theory.

Madison Reed separately challenges whether a reasonable consumer would be deceived by the numerous statements plaintiffs list in the Complaint, arguing that some are nonactionable puffery, while others are verifiably accurate statements or do not amount to partial misrepresentations.  *See* Compl. ¶¶ 20–30.  The fundamental problem here is that plaintiffs do not specifically allege which statements they actually saw and relied upon in deciding to purchase the Madison Reed hair products.  Without knowing which statements are part of this lawsuit and which are not, I will not rule now on the actionability of any statement listed in the Complaint.  In addition to fixing those deficiencies, plaintiffs are given leave to amend to explain how reasonable consumers would interpret the alleged statements and why they are likely to be deceived.  *See Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (finding that plaintiffs must plead "that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled").

### B.  Equitable Relief

Madison Reed seeks dismissal of the equitable relief claims under the CLRA, UCL, and FAL on grounds that plaintiffs have not alleged that they lack an adequate legal remedy.  *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020).  Plaintiffs acknowledge the Ninth Circuit's ruling in *Sonner* and, in their opposition brief, withdraw their claim for unjust enrichment.  To the extent that they seek other forms of equitable relief, plaintiffs are given leave to amend to expressly allege that their remedies at law are inadequate.  *See, e.g., In re JUUL Labs, Inc., Mktg., Sales Practices, and Products Liab. Litig.*, 497 F. Supp. 3d 552, 638–39 (N.D. Cal.

United States District Court
Northern District of California

2020) ("[P]laintiffs are given leave to amend to expressly allege that their remedies at law are inadequate and to support their claim to equitable restitution under the UCL and FAL," noting that hurdle was likely to be cleared given that "the allegations regarding unfair conduct are not otherwise coextensive with plaintiffs' legal claims and given the preliminary stage of these proceedings").

### C.     Injunctive Relief

Madison Reed also argues that plaintiffs have not adequately alleged standing to seek injunctive relief.  The Ninth Circuit in *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018) examined injunctive relief in the particular context of allegedly false advertising, finding that "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase." *Id.* at 969.  The Ninth Circuit explained that "[k]nowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." *Id.*  A sufficient threat of future harm "may be the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." *Id.* at 969–70.  Or that threat "may be the consumer's plausible allegations that she might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as she may reasonably, but incorrectly, assume the product was improved." *Id.* at 970.

Plaintiffs fail to make such allegations here.  They only generally allege that "[i]f the Court does not restrain Defendant from engaging in these practices in the future, Plaintiffs and the Class members will be harmed in that they will continue to purchase Products that are not better for hair health, or less harmful to human health, as represented by Defendant." Compl. ¶ 95.  The Complaint does not make clear whether plaintiffs are unable to rely on Madison Reed's representations in deciding if they should purchase the products in the future.  Nor does it straightforwardly allege that they want to or intend to purchase the product in the future. *Compare Anthony v. Pharmavite*, No. 18-CV-02636-EMC, 2019 WL 109446, at *6 (N.D. Cal. Jan. 4, 2019) (dismissing injunctive relief claim where the import of plaintiffs' allegation was that defendant

could do nothing to alter its advertising or product to make product beneficial to consumers and plaintiffs did not allege that they intended to purchase the accused product again in the future) *with IntegrityMessageBoards.com v. Facebook, Inc.*, No. 18-CV-05286-PJH, 2020 WL 6544411, at *7 (N.D. Cal. Nov. 6, 2020) (finding plaintiff alleged an "actual threat of future harm that is concrete and particularized because plaintiff alleged that "while [it] would like to resume advertising on Facebook, [it] cannot do so because [it] remain[s] unable to rely on Facebook's representations about the accuracy of its ad targeting"). Plaintiffs are given leave to amend to address this deficiency.

## CONCLUSION

Madison Reed's motion to compel Brown to arbitration is DENIED with respect to her public injunctive relief claim and GRANTED for her remaining individual claims. Madison Reed's motion to dismiss the Complaint is GRANTED with thirty (30) days leave to amend.

**IT IS SO ORDERED.**

Dated: August 30, 2021



William H. Orrick
United States District Judge