UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOLLY BROWN, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>MADISON REED, INC.,<br><br>  Defendant. | Case No. 21-cv-01233-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Re: Dkt. No. 51 |

Defendant Madison Reed, Inc. ("Madison Reed") moves to dismiss an amended class action complaint filed by plaintiffs Molly Brown and Audrey Sheffler ("the plaintiffs"), who allege that Madison Reed violated California consumer protection laws by falsely advertising its hair color products as free of harsh chemicals. The motion is GRANTED with prejudice. Multiple issues doom the plaintiffs' claims. Ohio law governs Sheffler's claims, not California's. Even if they were permitted by law, neither plaintiff has plausibly alleged a misrepresentation or omission that is likely to deceive reasonable consumers. Many of the statements that Brown allegedly relied upon fall outside the statute of limitations and are thus not actionable. The remaining statements either amount to puffery or are true and would not mislead a reasonable consumer. Sheffler has failed to allege with any specificity the misrepresentations she relied upon, instead proffering a commercial and webpages with multiple statements. And neither plaintiff has sufficiently pleaded an omission, primarily because Madison Reed disclosed the replacement chemicals.

**BACKGROUND**

Madison Reed manufactures and sells Madison Reed Hair Color Products ("the products"), which claim to "use ingredients that are less 'harsh' on hair health, as well as the health of the

user, than traditionally formulated hair color products." Second Amend. Compl. ("SAC") [Dkt. No. 44] ¶¶ 2-3. Madison Reed asserts this on its website, on the products' labeling, and in television, radio, mail, and online ads as part of its marketing campaign. *See id*. ¶¶ 7-8.

Brown, a citizen of California, purchased Madison Reed's "radiant Hair Color Kits" (in Catiana Brown and Ravenna Brown) on Madison Reed's website between early 2016 through 2019. *Id*. ¶ 28. In deciding to purchase the products, she relied on Madison Reed's statements on its website and on the products' packaging. *Id*. In early 2016, she read the following online:

- COLOR YOUR HAIR HEALTHY Free of harsh chemicals & full of natural nutrients

- HEALTHIER HAIR COLOR THAT WORKS

- BETTER FOR YOU Ammonia, Resorcinol, and PPD-Free with No Parabens Added

- Don't sacrifice your hair to get rich long-lasting results. Our advanced formula delivers luminous shine and 100% gray coverage without the stink, burn or itch of the harsh chemicals found in other colors.

- Smaller color molecules, called micropigments, create a gentler coloring process that doesn't require ammonia to aggressively open the hair cuticle to deposit the color the way other dyes do. Our formula has no pungent smell, leaves hair stronger and allows it to hold color longer.

- Formulated in Italy Under the Strictest European Union Standards for Health and Safety

- Madison Reed has re-engineered hair color to be healthier, cruelty-free, and still produce salon-quality results. Our color is handcrafted in Italy, where our color artisans constantly innovate the most effective formulas under the strictest EU standards for health and safety.

- You deserve better ingredients and performance from your hair color. That's why we removed harsh chemicals, and infused our color with ingredients that improve performance, to make your hair look and feel beautiful.

*Id*. ¶¶ 80, 82. Brown also read on the products' packaging that they were "free of" ammonia, PPD, and resorcinol. *Id*. ¶ 83.

Then, on September 3, 2017, Brown visited the Madison Reed website to "change the

color of the products she had been purchasing." *Id*. ¶ 86. There, she saw the statements "Salon Gorgeous," "Ingredients with Integrity," and "introducing the firs[t] smart 6-free hair color—free of ammonia, resorcinol [and] PPD."[1] *Id*. Brown "relied upon those statements in continuing to purchase the products," believing they were "gentler, safer, and healthier alternatives to traditional hair color products." *Id*. ¶¶ 86-87.

On March 10, 2018, Brown returned to the Madison Reed website "in order to request an earlier shipping of the products." *Id*. ¶ 84. She then read the statements "Ammonia Free" and "Salon-quality," which Brown again relied on in continuing to purchase the products. *Id*.

After using the products, Brown's hair turned brittle and she began to lose some of her hair. *Id*. ¶ 28. The hair loss stopped after she ceased using the products. *Id*.

Sheffler, a citizen of Ohio, bought two Madison Reed "radiant Hair Color Kits" (in Sondrio Brown) from the company's website around February 2021. *Id*. ¶ 29. In deciding to purchase the products, Sheffler relied on statements made in a Madison Reed commercial and on its website. *Id*. She also relied on the products' packaging that they were "free of" ammonia, PPD, and resorcinol. *Id*.

Sheffler saw a commercial for Madison Reed products around February 2021. *Id*. ¶¶ 29, 89. The SAC alleges that at one point, the commercial's narrator stated: "We started by throwing out the usual 'harsh ingredients,' instead Madison Reed is packed with all the things healthy hair does [sic]." *Id*. ¶ 89. When the narrator said "harsh ingredients," "the words 'ammonia,' 'resorcinol,' and 'PPD' immediately appear[ed] on the screen." *Id*. The commercial also twice included the statement "healthier hair color that works." *Id*.

After watching the commercial, Sheffler visited the Madison Reed website to further research the products. *Id*. ¶ 90. The SAC includes screenshots of two pages that she visited, which Sheffler alleges "reinforced and reconfirmed the messaging the products were free of certain harsh ingredients such as ammonia, resorcinol, and PPD." *See id*. ¶¶ 90-92.

Sheffler experienced scalp irritation and hair loss after using two bottles of the products.

---

[1] "PPD" stands for p-phenylenediamine. SAC ¶ 63.

3

*Id.* ¶ 29. The scalp irritation lasted about two months. *Id.* Her hair later started to grow back. *Id.*

Although Madison Reed markets its products as "gentler, safer, and healthier" and "free of 'harsh' ingredients" as compared to traditional hair products, the plaintiffs allege that the products instead endanger users and damage their scalp and hair. *See id.* ¶¶ 42, 55. The plaintiffs also contend that Madison Reed replaced key ingredients—ammonia, resorcinol, and PPD—with ethanolamine, 2-methylresorcinol, and toluene-2,5-diamine sulfate ("PTDS"), which are "no better" than the other chemicals. *Id.* at ¶¶ 58, 63, 67, 70. The plaintiffs assert that they would not have paid the money they did for the products had they known the products were "not safe" and, more specifically, that "ammonia was replaced by a more dangerous chemical." *Id.* ¶ 102.

Brown and another plaintiff, Keppie Moore, filed this class action suit in February 2021, alleging that Madison Reed violated California's Consumers Legal Remedies Act ("CLRA"), False Advertising Law ("FAL"), and Unfair Competition Law ("UCL"). Dkt. No. 1. Madison Reed moved to compel Brown to arbitrate her claims, which I denied with respect to her public injunctive relief claim but granted for her remaining claims. *See* Dkt. No. 25. I also granted Madison Reed's motion to dismiss the complaint as a whole for failure to state a claim. *See id.*

Brown and Moore then filed a First Amended Complaint ("FAC"), which Madison Reed again moved to dismiss. Dkt. Nos. 26, 29. I granted that motion on January 31, 2022, dismissing Moore's claims in their entirety without leave to amend, but granting Brown leave to amend hers. Dkt. No. 42. She and Sheffler filed the SAC on February 21, 2022. Dkt. No. 44. On April 15, 2022, Sheffler voluntarily dismissed with prejudice her individual claims, but not her claims for public injunctive relief. Dkt. No. 50.

Five days later, Madison Reed moved to dismiss the SAC. Dkt. No. 51. I heard arguments from both parties on July 13, 2022.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when

the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts her allegations as true and draws all reasonable inferences in her favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Fraud-based claims brought under the CLRA, UCL, and FAL must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009); *Brazil v. Dole Food Co., Inc.*, 935 F. Supp. 2d 947, 963 (N.D. Cal. 2013). When such claims are premised on misleading advertising or labeling, Rule 9(b) requires the plaintiff to allege "the particular circumstances surrounding [the] representations" at issue, regardless of whether they are affirmative misrepresentations or material omissions. *See Kearns*, 567 F.3d at 1126-27. To do so, the complaint must "identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (citation omitted).

**DISCUSSION**

**I.   SHEFFLER'S CLAIMS**

The parties dispute whether Sheffler, an Ohio resident, can assert claims under the CLRA, UCL, or FAL. *See* Mot. to Dismiss ("MTD") [Dkt. No. 51] 6:6; Oppo. [Dkt. No. 53] 5:11. The first question is which choice-of-law test applies. Madison Reed asserts that the general governmental interest test articulated in *Mazza v. American Honda Motor Company, Inc.*, 666 F.3d 581 (9th Cir. 2012), governs because Sheffler asserts claims under California's consumer protection laws. MTD at 6:7-25. The plaintiffs argue that *Nedlloyd Lines B.V. v. Superior Court*,

5

3 Cal. 4th 459 (1992), applies instead, as the Terms of Service to which Madison Reed and Sheffler agreed when she bought the products included a choice-of-law provision selecting California law. Oppo. at 5:12-18.

As the California Supreme Court has explained,

> California has two different analyses for selecting which law should be applied in an action. When the parties have an agreement that another jurisdiction's law will govern their disputes, the appropriate analysis for the trial court to undertake is set forth in *Nedlloyd* . . . which addresses the enforceability of contractual choice-of-law provisions. Alternatively, when there is no advance agreement on applicable law, but the action involves the claims of residents from outside California, the trial court may analyze the governmental interests of the various jurisdictions involved to select the most appropriate law.

*Washington Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 914-15 (2001). But the Ninth Circuit has held that *Nedlloyd* does not apply to all cases involving a sales contract with a choice-of-law provision. *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 561 n.5 (9th Cir. 2019). In *Hyundai*, the court, sitting en banc, decided that because the claims at issue arose "from the automakers' advertising misrepresentations, not the sales contracts," the governmental interest test applied. *See id*.

Similar to the claims in *Hyundai*, Sheffler's claims do not arise from the Terms of Service she agreed too; the SAC is void of any contract-related claims. Rather, they stem from Madison Reed's allegedly false and misleading misrepresentations or omissions. *See* SAC ¶¶ 143-146, 158-159, 172-174. *Hyundai* makes clear that the governmental interest test governs.[2]

The plaintiffs argue that the seemingly more limited language of the sales contract in *Hyundai* renders it inapplicable here. Oppo. at 7:15-8:4. But the terms to which Sheffler agreed are not as expansive as the plaintiffs suggest. Their own argument supports this—the opposition argues that the terms "expressly mandate that 'any action related' to the terms 'will be governed by the laws of the State of California.'" Oppo. at 7:21-8:2 (citing Granade Decl., Ex. 2 at 7) ("These Terms and any action related thereto will be governed by the laws of the State of

---

[2] This is consistent with my decision in *Maldonado v. Apple, Inc.*, No. 16-CV-04067-WHO, 2021 WL 1947512, at *6-7 (N.D. Cal. May 14, 2021). There, *Nedlloyd* applied because "the parties contracted to apply the law of California to disputes arising from their [Apple Care] contracts" and their claims indeed did. *Id*. at *7. The dispute at hand does not arise out of any contract.

6

California without regard to its conflict of laws provisions."). But this action is not related to the terms. Rather, it relates to Madison Reed's allegedly false and deceptive advertising.

To the extent that the plaintiffs contend that Madison Reed is estopped from arguing that the choice of law provision does not apply because Madison Reed argued for the enforceability of the Terms of Service on the motion to compel arbitration, this point is not persuasive. *See* Oppo. at 8:5-15. Those arguments involve two different provisions with different language. *See* Oppo., Granade Decl., Ex. 2 at 7; *see also TriPacific Capital Advisors, LLC v. Fed. Ins. Co.*, No. CV-21-919, 2022 WL 423409, at *4 (C.D. Cal. Jan. 28, 2022) (holding that a party's positions were not "clearly inconsistent" because there were "two different contract provisions at issue, each using different language"). The arbitration clause covers "any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof *or* the use of the Services or Content." *See* Oppo., Granade Decl., Ex. 2 at 7 (emphasis added). "Services" is defined as "the Site, our services, products, Color Bar products and services, and App." *See id.* at 1. But the choice-of-law provision only governs "[t]hese Terms and any action related thereto." *Id.* at 7.

The language of the arbitration clause is broader than that of the choice-of-law provision: The choice-of-law provision covers disputes related to the Terms of Service, while the arbitration clause covers disputes arising out of or relating to the Terms *or* the use of Madison Reed's services. I recognized a similar distinction in *Frenzel v. Aliphcom*, No. 14-CV-03587-WHO, 2015 WL 4110811, at *7-8 (N.D. Cal. July 7, 2015), finding that the choice of law provision in a website's terms of use covered only the terms and "any action related thereto," and thus did not apply because the plaintiff's claims were not based on the terms themselves. Estoppel is inapplicable in this context.

For these reasons, the governmental interest test provides the proper framework here. As articulated in *Mazza*, there are three steps in this analysis:

> First, the court determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different.

> Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists.
>
> Third, if the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state, and then ultimately applies the law of the state whose interest would be more impaired if its law were not applied.

666 F.3d at 590 (citation omitted). "Although *Mazza* was decided at class certification, the principle articulated in *Mazza* applies generally and is instructive even when addressing a motion to dismiss." *Cover v. Windsor Surry Co.*, No. 14-CV-05262-WHO, 2016 WL 520991, at *5 (N.D. Cal. Feb. 10, 2016) (citation omitted).

### A. Whether the Relevant California and Ohio Laws Are the Same or Different

There are material differences between the relevant California laws (the CLRA, FAL, and UCL) and Ohio laws (the Ohio Deceptive Trade Practices Act ("ODTPA") and Consumer Sales Practices Act ("OCSPA")).

The ODTPA prohibits several forms of "deceptive trade practices" and provides a cause of action of a "person" injured by such practices. *See* Ohio Rev. Code §§ 4165.02, 4165.03(A)(2). Although there is a split among courts in Ohio, the majority position is that "the ODTPA does not provide consumers standing," instead limiting it to commercial entities. *See, e.g., Gentile v. Merck & Co., Inc.*, No. 19-CV-4174, 2022 WL 1084883, at *2-3 (S.D. Ohio Apr. 11, 2022) (describing the split in authority and majority view); *In re Toyota RAV4 Hybrid Fuel Tank Litig.*, 534 F. Supp. 3d 1067, 1116-18 (N.D. Cal. 2021) (same); *see also In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 932-33 (N.D. Cal. 2018) (finding that consumers cannot bring an ODTPA claim as a matter of law). As the court explained in *Gentile*, the Sixth Circuit approved the majority view in its "only venture into ODTPA standing," made in a 2013 unreported decision. *See* 2022 WL 1084883, at *3 (citing *Holbrook v. Louisiana-Pac. Corp.*, 533 F. App'x 493 (6th Cir. 2013)). Given the weight of authority among courts in Ohio, and my own colleagues' decisions in *Toyota* and *Nexus 6P*, I agree that, unlike the CLRA, UCL, and FAL, the ODTPA does not allow consumers to bring claims. This difference is material; an entire group of plaintiffs

8

who can assert claims under the applicable California laws are barred from doing so in Ohio.

The OCSPA prohibits unfair, deceptive, or unconscionable acts or practices by suppliers in connection with consumer transactions. Ohio Rev. Code §§ 1345.02(A), 1345.03(A). The most significant difference between the OCSPA and the relevant California laws is the former's notice requirement for class action claims. "Under the OCSPA, consumers may seek relief in a class action only if the defendant was sufficiently on notice that its conduct was deceptive or unconscionable under the statute at the time it committed the alleged acts." *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 868 (S.D. Ohio 2012). Plaintiffs must demonstrate "that either (1) the alleged violation is an act or practice that was declared to be deceptive or unconscionable by a rule adopted by the Attorney General before the consumer transaction on which the action is based or (2) the alleged violation is an act or practice that was determined by a court to violate the OCSPA and the court's decision was available for inspection before the transaction took place." *Id.* (citing Ohio Rev. Code § 1345.09(B)). The alleged conduct must be "substantially similar" to the act or practice previously declared to be deceptive in order for the class action to proceed. *Id.*

The CLRA, UCL, and FAL do not impose such a requirement. Although the CLRA requires a consumer to give the defendant notice of the alleged violation at least 30 days before commencing an action, it does not require a specific showing that the defendant had notice that its conduct had been previously declared unlawful. *See* Cal. Civ. Code § 1782. Again, the difference is material, as the Ohio law's notice requirement limits the type of claims that prospective class-action plaintiffs may bring.

**B.     Each Jurisdiction's Interest in the Application of Its Own Law**

As the *Mazza* court recognized, "each state has an interest in setting the appropriate level of liability for companies conducting business within its territory." 666 F.3d at 592 (citation omitted). "[S]tates may permissibly differ on the extent to which they will tolerate a degree of lessened protection for consumers to create a more favorable business climate for the companies that the state seeks to attract to do business in the state." *Id.*

Sheffler asserts consumer protection claims against a California business based on a commercial and website she viewed and relied on in purchasing products from Ohio. *See* SAC ¶¶

9

25, 29. Given these circumstances, both California and Ohio have an interest in applying their own laws, meaning a true conflict exists.

### C.  Which State's Interest Would be More Impaired

"California's interest in applying its law to residents of foreign states is attenuated." *Mazza*, 666 F.3d at 594.  This state recognizes that "with respect to regulating or affecting conduct within its borders, the place of the wrong has the predominant interest." *Id*. at 593 (citing cases).  That "place of wrong" is "the state where the last event necessary to make the actor liable occurred." *Id*.  The *Mazza* court—and others since—have recognized that in cases like the one at hand, the last events necessary for liability include the communication of the marketing materials, and the plaintiff's reliance on those materials in purchasing the products. *See id*. at 594; *see also Cover*, 2016 WL 520991, at *8; *Julian v. TTE Tech., Inc.*, No. 20-CV-02857-EMC, 2020 WL 6743912, at *9-10 (N.D. Cal. Nov. 17, 2020).  When the place of the wrong is a foreign state, these courts have held that "foreign states have a strong interest in the application of their laws to transactions between their citizens and corporations doing business within their state" that outweighs California interests, even if the defendant is based in California and the alleged misrepresentations originated there. *See Mazza*, 666 F.3d at 593-94; *see also Cover*, 2016 WL 520991, at *8 (citing cases).  Accordingly, the plaintiffs' consumer protection claims are "governed by the consumer protection laws of the jurisdiction in which the transaction took place." *Mazza*, 666 F.3d at 594; *see also Potter v. Chevron Prods. Co.*, No. 17-CV-06689-PJH, 2018 WL 4053448, at *12 (N.D. Cal. Aug. 24, 2018) (dismissing UCL, CLRA, and FAL claims because the named plaintiffs' transactions took place in Illinois).

As confirmed at oral argument, Sheffler viewed the Madison Reed commercial and visited the company's website in Ohio, then relied on those statements in purchasing the products in Ohio.  Ohio is therefore the place of the wrong.  Ohio's interest in applying its laws to transactions between citizens and corporations that occur in its own state outweighs California's attenuated interest in applying its laws to residents of other states.  Sheffler's consumer protection claims are governed by the consumer protection laws of the jurisdiction in which the transaction took place: Ohio.  Her CLRA, FAL, and UCL claims are DISMISSED.

## II. STATUTE OF LIMITATIONS

Madison Reed next argues that Brown's claims are time-barred by their respective statute of limitations. MTD at 11:5-9. Relevant here is that the SAC was Brown's third attempt to address the issues raised by Madison Reed.

CLRA and FAL claims are subject to a three-year statute of limitations; UCL claims to a four-year statute. *See* Cal. Civ. Code § 1783; Cal. Civ. Proc. Code § 338(a); Cal. Bus. & Prof. Code § 17208. Under California law, the statute of limitations "runs from the moment a claim accrues." *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1191 (2013). Because these three statutes "proscribe misleading, false, or otherwise deception practices or statements in transactions for the sale or lease of goods to consumers," a cause of action under each "accrues when a defendant misrepresents or omits material information regarding a product or service and a consumer makes a purchase as a result of such deceptive practices." *Plumlee v. Pfizer, Inc.*, No. 13-CV-00414-LHK, 2014 WL 695024, at *7 (N.D. Cal. Feb. 21, 2014).

The SAC alleges that Brown purchased the products after relying on Madison Reed's statements on three specific occasions: in "early 2016," on September 3, 2017, and on March 10, 2018. SAC ¶¶ 80, 84, 86. Brown filed this suit on February 19, 2021. Dkt. No. 1. For her CLRA or FAL claims to be timely, then, they must have accrued on or after February 19, 2018. For the UCL claim to be timely, it must have accrued on or after February 19, 2017.

The parties dispute whether the first purchase (in early 2016) or last purchase (on March 10, 2018) is the proper focus of the analysis. *See* MTD at 11:5-9 (arguing that the claims are time-barred because the alleged reliance and purchase occurred in early 2016); Oppo. at 9:21-10:3 (arguing that the last purchase determines whether the claims are timely). In *Plumlee*, Judge Koh considered multiple purchases the plaintiff made over a three-year period, the last of which occurred "on or about June 2008." *See* 2014 WL 695024, at *3, *7. She held that this was "the last date on which plaintiff could have suffered her alleged economic injury, and the last date on which her claims could have accrued." *Id*. at *7.

Adopting this rationale, the early 2016 purchase falls outside the statute of limitations for the CLRA, FAL, and the UCL, as it was made about five years before Brown filed suit. The

11

1  September 3, 2017, purchase is actionable under the UCL, but not the CLRA or FAL. The March

2  10, 2018, purchase is actionable under all three statues.

3  The SAC alleges that the plaintiffs are entitled to equitable tolling because of both the

4  discovery rule and Madison Reed's fraudulent concealment.[3] SAC ¶¶ 118-126. The discovery

5  rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover,

6  the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005). The

7  fraudulent concealment doctrine "tolls the statute of limitations where a defendant, through

8  deceptive conduct, has caused a claim to grow stale." *Aryeh*, 55 Cal. 4th at 875. "Both doctrines

9  require showing (1) when the alleged discovery of the violation or fraud occurred, (2) the manner

10 or circumstances of the discovery, and (3) reasonable diligence that the discovery could not be

11 made earlier." *Johnson v. Glock, Inc.*, No. 20-CV-08807-WHO, 2021 WL 1966692, at *4 (N.D.

12 Cal. May 17, 2021) (citing cases).

13 Brown failed to provide enough detail to adequately allege any of these required elements.

14 The SAC alleges that the plaintiffs "did not discover, and could not have discovered, through the

15 exercise of reasonable diligence, the full and complete nature of the defect and risks associated

16 with the normal and foreseeable use of the products." SAC ¶ 118. It further contends that the

17 plaintiffs "had no realistic ability to discern the risks associated with normal and foreseeable use

18 of the products until—at the earliest—after they suffered severe, adverse reactions to the

19 products." *Id.* ¶ 120. Even then, the SAC alleges, they "had no basis to discover their causes of

20 action" because of Madison Reed's "misleading statements and active concealment of the true

21 nature of the defect and risks." *Id*.

22 Notably absent are any allegations related to when the alleged discovery occurred or the

23 manner or circumstances under which it did. Moreover, the allegation that Brown could not have

---

[3] The SAC also alleges that Madison Reed is "estopped from relying on any statutes of limitations defense." SAC ¶ 130. The plaintiffs argue in their opposition that because Madison Reed submitted a declaration on the motion to compel arbitration that states that Brown made 40 online orders between January 24, 2016, and March 7, 2019, it is now estopped from claiming that the September 3, 2017, and March 10, 2018, purchases were not in fact purchases. *See* Oppo. at 10:20-11:20 (citing Dkt. No. 15-1). The argument is moot. The SAC clearly alleges that Brown purchased the products on these dates. *See* SAC ¶¶ 84, 86.

discovered the defects through the exercise of reasonable diligence is questionable. The SAC alleges that her hair "turned brittle" and she "began to suffer some hair loss" after using the products. *Id*. ¶ 28. Those severe adverse reactions are not what one would expect from "Salon - quality hair" and would put a reasonable consumer on notice that the products were not as advertised. *See Fox*, 35 Cal. 4th at 807. Although Brown might not have discovered the full nature of the claim until later, given the number and complexity of ingredients allegedly used in the Madison Reed products, the problem is that she provides no facts supporting when and how she discovered the allegedly misleading nature of the 2016 statements.

Brown's claims based on her 2017 and 2018 purchases are not time-barred. However, the early 2016 purchase falls outside the statute of limitations for the UCL, FAL, and CLRA. I will not consider it, or the statements that Brown relied upon in making that purchase, in evaluating the sufficiency of her claims. I will, however, consider the September 3, 2017, purchase in weighing Brown's UCL claim, and the March 10, 2018, purchase for all of her claims.

### III. SUFFICIENCY OF CLAIMS

Turning to the claims themselves, Brown has failed to sufficiently state claims under the CLRA, UCL, or FAL. So has Sheffler, even if California law governed her claims.

The CLRA prohibits "unfair or deceptive acts or practices" undertaken in the sale or lease of goods. Cal. Civ. Code § 1770(a). The UCL forbids "any unlawful, unfair, or fraudulent business act or practice" along with "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200. The FAL outlaws any "unfair, deceptive, untrue, or misleading advertising." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citing Cal. Bus. & Prof. Code § 17500).

Claims brought under these three statutes are subject to the reasonable consumer test. *Cheslow v. Ghirardelli Chocolate Co.*, 445 F. Supp. 3d 8, 15 (N.D. Cal. 2020). To satisfy this standard, the plaintiff must show that "members of the public are likely to be deceived." *Williams*, 552 F.3d at 938. "This requires more than a mere possibility that [a statement] might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016). Instead, the plaintiff must show "a probability that

13

a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id*. (citation and quotation marks omitted). Although this is generally a question of fact not suitable for disposition on a motion to dismiss, "in rare situations a court may determine, as a matter of law, that the alleged violations of the UCL, FAL, and CLRA are simply not plausible." *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1193 (N.D. Cal. 2014).

### A. Misrepresentation

#### 1. Brown's Claims

Because of the statute of limitations, many of the statements Brown allegedly relied upon when buying the products are not actionable. Only the statements that she relied upon in making the September 3, 2017, and March 10, 2018, purchases are actionable. As pleaded in the SAC, for the September 2017 purchase, those statements are: "Salon Gorgeous," "Ingredients with Integrity," and "Introducing the firs[t] smart 6-free hair color—free of ammonia, resorcinol [and] PPD." SAC ¶ 86. For the March 10, 2018, purchase, Brown allegedly relied on two statements: "Ammonia Free" and "Salon-quality." *Id*. ¶ 84.[4]

Most of these statements are non-actionable puffery. "Advertisements that amount to 'mere puffery' are not actionable because no reasonable consumer relies on puffery. Factual representations, however, are actionable." *Stickrath v. Globalstar, Inc.*, 527 F. Supp. 2d 992, 998 (N.D. Cal. 2007) (citations omitted). "Non-specific, non-measurable assertions are classic non-actionable puffery." *Sommer v. Snapple Beverage Corp.*, No. 20-CV-04181-JST, 2021 WL 6754525, at *1 (N.D. Cal. Sept. 20, 2021) (citation omitted); *see also Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997) ("product superiority claims that are vague or highly subjective often amount to nonactionable puffery"). A court may determine as a matter of law whether a statement is puffery. *Krommenhock v. Post Foods, LLC*, 255 F. Supp. 3d 938, 964 (N.D. Cal. 2017) (citing cases).

---

[4] Although the SAC also alleges that Brown relied on statements made on the products' packaging, it does not allege that she relied on those statements in making the purchases on September 3, 2017, and March 10, 2018. *See* SAC ¶¶ 84, 86.

14

1  The statements "Salon Gorgeous," "Ingredients with Integrity," and "Salon-quality" are
2  neither specific nor measurable. They make no factual representations. Rather, they are vague,
3  generalized, and subjective statements about the products. This is classic puffery. This is true
4  even considering the statements alongside the others—that the products are "free of ammonia,
5  resorcinol [and] PPD" or "Ammonia Free." *See Krommenhock*, 255 F. Supp. 3d at 965 (holding
6  that a statement must be considered in context in order to assess whether it is mere puffery).
7  Although a reasonable consumer might rely on the factual representation that the products were
8  "free of" certain ingredients, she would recognize the remaining statements—that the products
9  were "Salon Gorgeous," "Salon-quality," or used "Ingredients with Integrity"—as vague product
10 superiority claims that "no reasonable consumer would take as anything more weighty than an
11 advertising slogan." *See Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th
12 1351, 1361 (2003).

That leaves two remaining statements underlying Brown's claims: that the products were "free of" ammonia, resorcinol, and PPD, and "Ammonia Free." *See* SAC ¶¶ 84, 86. As I previously noted, "[t]ruth is not an absolute shield to liability under the UCL, FAL, or CLRA." Order Granting Mot. to Dismiss FAC ("Second MTD Order") [Dkt. No. 42] 6:16-17. The California Supreme Court has held that these laws "prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002) (citation and quotation marks omitted).

These statements are factually true; the plaintiffs do not dispute that the products are indeed "free of" ammonia, resorcinol, and PPD. *See, e.g.,* Oppo. at 20:1-5 (describing these as "true" or "truthful" statements). Rather, the plaintiffs allege that these statements caused Brown to believe that the products were "healthier/better for human use" and "gentler, safer, and healthier than other hair coloring products." *See, e.g.,* SAC ¶¶ 86-87.

But the statements "free of ammonia, resorcinol [and] PPD" and "Ammonia Free" do not make any assertions about the health, safety, or gentleness of the products. These statements on their own do not claim to be healthier, safer, or gentler than other hair color products. As in other

15

cases involving factually true statements, these statements would not cause a reasonable consumer to believe that Madison Reed's products are healthier or safer than others, let alone a significant portion of the general public or targeted customers. *See, e.g., Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1093 (N.D. Cal. 2017) (finding that the factually true statement "MADE WITH Real Fruit" would not cause a reasonable consumer to believe that fruit bars were free of trans fat); *Red v. Kraft Foods, Inc.*, No. CV-10-1028, 2012 WL 5504011, at *4 (C.D. Cal. Oct. 25, 2012) (finding that it "strains credulity to imagine that a reasonable consumer will be deceived into thinking a box of crackers is healthful or contains huge amounts of vegetables simply because there are pictures of vegetables and the true phrase 'Made with Real Vegetables' on the box"). Importantly, the statements that the products are "free of" these ingredients are the only actionable statements for Brown's claims—the others either fall outside the statute of limitations, amount to nonactionable puffery, or were not expressly relied on by Brown in buying the products in 2017 and 2018. Brown therefore does not plausibly plead claims based on a false representation.

### 2. Sheffler's Claims

The SAC alleges that in deciding to purchase the products, Sheffler "relied on a host of defendant's false, misleading, and deceptive written misrepresentations she learned via a video commercial . . . as well as the Madison Reed website." SAC ¶ 29. It also alleges that she relied on the products' packaging, stating that they were "free of" ammonia, PPD, and resorcinol. *Id*.

The allegations repeat several of the mistakes that sank previous iterations of these claims in this case. Sheffler says that she relied on a "host" of purported misrepresentations. As alleged in the SAC, the statements made in the commercial include: "We started by throwing out the usual 'harsh ingredients,' instead Madison Reed is packed with all the things healthy hair does [sic]," and "Healthier Hair Color That Works." *Id*. ¶ 89. It also alleges that when the narrator said the phrase "harsh ingredients," "the words 'ammonia,' 'resorcinol,' and PPD'" appeared on the screen. *Id*.

The SAC also alleges that Sheffler saw the following pages on Madison Reed's website:



SAC ¶¶ 90-91.

The problem is that Sheffler does not identify with enough specificity which of the statements she relied upon in purchasing the products. Instead, she proffers a commercial and two screenshots, the latter of which contains eleven sentences. Some of the statements and phrases contained within (i.e., "ingredients with integrity") amount to puffery. Others are not relevant (i.e., "We've partnered with honest and transparent manufacturers in Italy."). I stated in my prior Order dismissing Brown's claims that many of these statements, "in isolation, could be puffery, but if combined with others, might constitute misrepresentations." Second MTD Order at 10:19-20. But just as before, despite my warning, the "range of statements cited . . . make it difficult to

17

ascertain what particular representations [were] relied upon in purchasing the products and, ultimately, how they might be fraudulent." *Id*. at 10:22-25.

Similarly, I warned plaintiffs not to rely simply on the products' packaging to save the misrepresentation-based claims, yet Sheffler did so. The box accurately states that the products are "free of" ammonia, resorcinol, and PPD, as affirmed by the ingredient list. *See id*. at 6:15-7:16. To put it plainly: there was no initial misrepresentation made, let alone one for the ingredient list to cure.[5]

Sheffler has not sufficiently pleaded any misrepresentation because she has not identified the particular statements underlying her claim to show how they were fraudulent.

### B. Omission

"Omissions may be the basis of claims under California consumer protections laws, but to be actionable the omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose." *Hodsdon v. Mars*, Inc., 891 F.3d 857, 861 (9th Cir. 2018) (citation omitted). There are two situations in which such a duty to disclose arises. First is when the undisclosed information "cause[s] an unreasonable safety hazard." *Id*. at 861-62. Second is when (1) the omission is material, (2) the defect is central to the product's function, and (3) one of the *LiMandri* factors is met. *Id*. at 863. Those factors are:

(1) when the defendant is the plaintiff's fiduciary;

(2) when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff;

(3) when the defendant actively conceals a material fact from the plaintiff; and

---

[5] The same appears to be true for one of the Madison Reed webpages that Sheffler cites. The screenshot at Paragraph 91 states that the products are "free of" ammonia, which allegedly "reinforced and reconfirmed the messaging the products were free of certain harsh ingredients." SAC ¶¶ 91-92. Madison Reed asks that I take notice of archived material from the Madison Reed website, captured using the Internet Archive's Wayback Machine and showing the website on January 27, 2021, when the webpage also states: "We never use ammonia in any of our formulas. Instead, we use ethanolamine. . ." *See* Def. RJN [Dkt. No. 52], Richardson Decl., Ex. A. I will take notice of the two exhibits, as they contain facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *Parziale v. HP, Inc.*, No. 19-CV-05363-EJD, 2020 WL 5798274, at *3 (N.D. Cal. Sept. 29, 2020) (noting that courts routinely take notice of content from the Internet Archive's Wayback Machine).

> (4) when the defendant makes partial representations that are misleading because some other material fact has not been disclosed.

*Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255 (2011), *as modified* (Dec. 28, 2011) (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997)).

As an initial matter, it is somewhat difficult to ascertain the precise omission at issue. The SAC alleges that Madison Reed omitted "the material fact that the products contained ingredient replacements that were not better for hair health or less harmful to human health than the ingredients used in traditional hair color formulas." *See, e.g.,* SAC ¶¶ 146, 176. In the opposition, however, the plaintiffs allege that Madison Reed omitted that ammonia was replaced with ethanolamine, PPD with PTDS, and resorcinol with 2-methylresorcinol. Oppo. at 23:21-24:8.

The plaintiffs miss the key issue. Although they have plausibly pleaded that the replacement chemicals pose a safety hazard, imposing upon Madison Reed a duty to disclose, Madison Reed *did* disclose that its products contained ethanolamine, 2-methylresorcinol, and PTDS. *See* Second MTD Order at 8:5-19. The ingredient list included on the box of products and on the website state them. *See* SAC ¶ 97 (images of ingredient list); Def. RJN, Exs. A-B (webpages stating that ammonia was replaced by ethanolamine, resorcinol by 2-methylresorcinol, and PPD by PTDS). Sheffler's claims are based on the product box and the website, which she visited in 2021 when the noticed images were captured, *see* SAC ¶ 29, and Madison Reed plainly disclosed the replacement ingredients in both places.

To the extent that Brown relied on other statements, nothing about the phrases "Salon Gorgeous," "Ingredients with Integrity," or "Salon-quality" represent that the ingredients were better for hair health or less harmful to human health than traditional products. *See id*. ¶¶ 84, 86. The same is true for the statements that the products were "free of" ammonia, resorcinol, and PPD, and "Ammonia Free." *See id*. Any omission about ethanolamine, 2-methylresorcinol, and PTDS was therefore not contrary to the representations at issue.

For these reasons, neither plaintiff has plausibly pleaded FAL, UCL, or CLRA claims based on either a misrepresentation or an omission.

## IV. LEAVE TO AMEND

If a court dismisses a complaint, it should grant leave to amend "unless it determines that

the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In deciding this, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

The plaintiffs requested leave to amend should I dismiss any portion of their SAC. Oppo. at 25:6-10. The request is DENIED. This is Brown's third attempt to state plausible claims. She has been on notice of many of the above-described deficiencies since I dismissed her first complaint in August 2021, yet they persist here. *See* Dkt. Nos. 25, 42. To the extent that Sheffler, a new plaintiff, has not had the same opportunity to amend, Ohio law governs her claims. Alleging other facts cannot cure her claims, as they are barred as a matter of law.

## CONCLUSION

The motion to dismiss is GRANTED and the claims DISMISSED with prejudice.

**IT IS SO ORDERED.**

Dated: August 19, 2022



William H. Orrick
United States District Judge

20